COURT OF APPEALS OF VIRGINIA

Present: Judges Chafin, Malveaux and Senior Judge Haley

LOREN HUNT

v.     Record No. 0811-18-3

CITY OF ROANOKE DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
MARCH 12, 2019

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
David B. Carson, Judge

(Brittany F. Gordon; Steidle Law Firm, on brief), for appellant.
Appellant submitting on brief.

(Daniel J. Callaghan, City Attorney; Heather P. Ferguson, Assistant
City Attorney; Shannon L. Jones, Guardian *ad litem* for the minor
child, on brief), for appellee.  Appellee and Guardian *ad litem*
submitting on brief.


     Loren Hunt (mother) argues that the circuit court erred in terminating her parental rights to

her children and approving the foster care goal of adoption.  Upon reviewing the record and briefs

of the parties, we conclude that the circuit court did not err.  Accordingly, we affirm the decision

of the circuit court.

BACKGROUND

     "On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'"  Farrell v. Warren Cty.

Dep't of Soc. Servs., 59 Va. App. 375, 386 (2012) (quoting Jenkins v. Winchester Dep't of Soc.

Servs., 12 Va. App. 1178, 1180 (1991)).

_____

     * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Mother is the biological parent to two children, J.M. and M.H., who are the subject of this appeal.[1] The City of Roanoke Department of Social Services (the Department) first became involved with the family in 2010 because of allegations of poor parenting of J.M. and illegal drug use in front of the child. The Department received additional complaints in 2011 and 2013 due to drug use and inadequate supervision, as well as the fact that M.H. was born substance exposed to cocaine and marijuana.

In March 2016, mother was participating in Drug Court, stemming from a charge of selling leased property. She and the children were living at the Rescue Mission. On March 18, 2016, she tested positive for drugs and was incarcerated for thirty days. Mother told the Department that the children could not stay with their biological fathers because James McGriff was incarcerated and she recently had obtained a protective order against Eric Hunt. Mother indicated that a friend could care for the children while she was incarcerated. Mother also advised that J.M. was diagnosed with attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), and sensory processing issues, and he was taking prescription medicine for his behavioral issues.

After speaking with mother's friend who agreed to care for the children, the Department transported J.M. and M.H. to the friend's home on March 18, 2016. At the time, J.M. was six years old, and M.H. was two years old. On March 21, 2016, mother's friend informed the Department that she only could care for the children for a few more days because she did not have child care for the children while she was at work and the children required constant supervision. Mother did not have any other family or friends who could act as alternative placements, so on March 22, 2016, the Department obtained temporary legal custody of the

_____

[1] James M. McGriff is the biological father of J.M., and Eric Hunt is the biological father of M.H.

children. The Department placed the children in separate foster homes because of J.M.'s behaviors toward M.H. The City of Roanoke Juvenile and Domestic Relations District Court (the JDR court) adjudicated that the children were abused or neglected, and on May 17, 2016, it entered the dispositional order.

When the children entered foster care, the Department reviewed with mother what was required of her before the children could return home. Mother was required to maintain contact with the Department, obtain and maintain stable housing and employment, complete a psychological and parental capacity evaluation and follow through with all recommendations, participate in psychiatric services and comply with medication management, complete a parenting class, participate in individual counseling, complete a substance abuse assessment and follow through with all recommendations, submit to random drug screens, complete a domestic violence assessment and follow through with all recommendations, and participate in visitation. Mother completed the domestic violence assessment and the recommended eighteen-week domestic violence alternative program. She also completed two parenting classes and received feedback from a parenting coach after visitations. In addition, mother completed the substance abuse assessment and recommended treatment program. However, in March 2017, mother was arrested for violating her probation after she tested positive for marijuana.

Mother also consistently participated in visitation. Initially, the Department arranged for mother to visit with J.M. and M.H. together. However, J.M. would try to parent M.H., and then, the children would become "very aggressive." Mother had a hard time redirecting the children, so the Department decided to separate the visits.

When J.M. entered foster care, he "really struggled with any type of boundaries, any type of rules," and it was apparent that he had been in an "unstructured environment." The Department continued with J.M.'s medication management and arranged for therapeutic day

treatment services at his new school and individual counseling. For the first couple of visitations with mother, J.M. had "no response at all," but with subsequent visitations, J.M. became agitated before the visit and said that he did not want to go to the visitation. During the visitations, mother tried to engage J.M., but he was aggressive and became "out of control physically." The social worker gave mother feedback, to which mother was receptive. However, the social worker noticed that mother had difficulty implementing what she was taught.

At the end of each visit, J.M. displayed "a lot of anger" and cried. J.M. said that he no longer wanted to visit with mother. On August 19, 2016, J.M. cried and refused to go in the building to visit with mother. The social workers did not believe that it was in J.M.'s best interests to carry him inside and force him to visit with mother. After that incident, the Department stopped all in-person visitations between mother and J.M.; however, it did allow them to have phone contact. The social worker noticed that J.M.'s behavior improved and his anxiety level decreased after the in-person visits stopped.

In September 2016, Miles Davidson, a licensed social worker, began working with J.M. and his anxiety issues. In addition to J.M.'s other diagnoses, Davidson diagnosed J.M. with post-traumatic stress disorder. Davidson met with mother on four occasions in November and December 2016 and found that she did not have "much space to have attention for [J.M.], that she had a lot of her own issues that she was focused on." Davidson testified that J.M. needed "a very clear structure, stable routine." Davidson emphasized that J.M.'s caregivers needed to understand "how to handle his tantrums, [and] how to sort of provide kind and firm boundaries with him." After his sessions with mother, Davidson concluded that mother would not be able to meet those requirements.

M.H. also showed signs of trauma when he entered foster care. When M.H. entered foster care, he was non-verbal, anxious, "[v]ery withdrawn and sad," and intolerant of physical

- 4 -

affection. He saw a gastrointestinal doctor because he had "constant diarrhea" for months, and the doctor determined that the diarrhea was in response to stress, especially after visitations.

Robin Wiley was M.H.'s counselor from July 2016 until June 2017. Wiley also noticed that M.H. experienced "great anxiety" before and after visitation, so she recommended that the Department reduce mother's visitation with M.H., which it did in January 2017. M.H.'s anxiety appeared to lessen once the visitations decreased. Subsequently, the visitations stopped, and M.H.'s foster mother noticed a drastic improvement in M.H. He suddenly began talking more, and he started to accept physical affection. His aggression at daycare and preschool decreased. By September 2017, M.H.'s new counselor reported that M.H. was doing "[r]eally well."

In addition to offering visitation and counseling services for the children, the Department required mother to participate in a psychological and parental capacity evaluation with Dr. Klaire Mundy, which she did on September 8, 2016. Dr. Mundy reviewed mother's childhood history, as well as her history of substance abuse and mental illness. Mother had been diagnosed with depression, anxiety, bipolar disorder, and borderline personality disorder. She participated in counseling and was prescribed medication, but did not always take it. In addition, mother experienced a lot of trauma and instability in her childhood. Dr. Mundy opined that mother's "childhood history had modeled an unstable foundation of parenting and the likelihood of impaired attachment is likely a result of the abuse and neglect she experienced in her own upbringing." Dr. Mundy stated that it would "take pretty much a lifetime" for mother to change her ways and be able to parent her children effectively. Dr. Mundy recommended that mother participate in "consistent and ongoing" psychiatric and psychological services.

After receiving reports from the children's counselors and Dr. Mundy, the Department required mother and the children to participate in attachment assessments with Susan Brammer, which mother did on April 13, 2017. Brammer explained that "[i]f a child does not have a secure

attachment foundation from birth, then the rest of development is affected by this." Insecure or disordered attachment negatively affects a child's behavior, emotions, cognitive ability, and future relationships.

The assessment appointment was the first time that mother had seen J.M. since their in-person visits stopped in the summer of 2016. Mother's interactions with J.M. were "quite concerning" to Brammer because mother displayed such an "immature" parenting ability. Mother had difficulty setting limits and became "frustrated," which exacerbated J.M.'s behaviors. Despite the fact that mother had completed her parenting classes at the time, Brammer concluded that mother "had no clue" how to help J.M. calm down once he became aggressive and disorganized.

Brammer also discovered that mother "did not set any limits for dangerous or aggressive play" and displayed "childish" and "juvenile" behavior with M.H. Mother and M.H. became so loud that Brammer had to ask them to quiet down because they were in an office building. Mother asked her "how do I do that." Brammer described mother as "a boisterous playmate," not a parent.

Brammer explained that both children were "showing significant signs" of post-traumatic stress disorder after the visits, and she recommended that visitations with mother be terminated. Although mother had been in counseling "for an extended period of time" when the assessment was conducted, mother "was triggered by the boys into her disorganized behavior." Brammer opined that if the children were returned to mother's custody, "they would continue to form attachment with her that is disorganized, which would lead to continued behavioral problems." Brammer was not optimistic that attachment therapy would be successful because mother was so "disorganized." After receiving the attachment assessment, the Department stopped mother's phone contact with J.M. and visitations with M.H.

On August 22, 2017, the JDR court denied the Department's petition to terminate mother's parental rights and disapproved the foster care plan with the goal of adoption. The Department appealed the JDR court's rulings to the circuit court.

The parties appeared before the circuit court on January 24 and April 3, 2018.[2] The Department presented evidence that mother did not have stable employment while the children were in foster care. She had jobs at several different establishments for short periods of time, and at the time of the January 2018 hearing, she had been employed at a job for three months. By the April hearing, mother had a new job because her former employer went bankrupt. Mother testified that she was working eighteen hours per week and could only work part-time because she received SSI.

The Department also presented evidence that mother had not had stable housing since 2011. At first, she and the children were living at the Rescue Mission, and then mother was incarcerated, which led to the children ultimately being placed in foster care. When mother was released from jail, she went back to the Rescue Mission and then transferred to the Tabitha Program within the mission, which was intended to help her with self-sufficiency. After having difficulty with the Tabitha Program for several weeks, mother was removed from the program. In August 2016, mother lived with her girlfriend and her girlfriend's three children at a hotel and, then, in September 2016, moved with her girlfriend and the children to an apartment. In February 2017, the Department informed mother that her girlfriend had an "extensive CPS history," which would prevent the Department from placing the children with them. Despite the warning, mother and her girlfriend continued to live together. In June 2017, mother and her girlfriend were evicted from the apartment and moved to another hotel. In November 2017, mother started renting a three-bedroom apartment, and she told the Department that her girlfriend

---

[2] Eric Hunt was not served in time to participate in the circuit court hearing.

did not live there.  The Department deemed the apartment to be suitable for the children, so long as mother's girlfriend did not live with her.  At the April hearing, mother testified that she continued to live in the same residence.

The Department explained that although mother had completed a "great deal of services," it remained concerned that mother "still struggles to implement the services that she's learned and the skills that she's learned."  Even after she took the parenting classes, mother could not set boundaries with the children and could not de-escalate the situation when the children became aggressive or loud.  Furthermore, the children had experienced "significant trauma" while in her care, but she refused to believe that the children were traumatized or neglected.

Mother presented additional evidence that she had completed the required services, including counseling.  Jordonna Anderson, mother's counselor since February 2016, testified that mother consistently attended counseling.  Anderson believed that mother "could always benefit from the in home and mental health support," as well as mental health skills building.  Anderson opined that with that support, mother was "capable of raising the children."

Mother testified about her participation in Drug Court.  As of the April 2018 hearing, mother remained in Drug Court, but hoped to graduate in a year.  She explained that she still had fifty-two out of one hundred hours of community service to complete, and she still had to pay her restitution and fees.

At the conclusion of all of the evidence, the circuit court asked the parties to submit their closing arguments in writing, which they did.  On April 24, 2018, the circuit court issued a letter opinion finding that it was in the children's best interest to terminate mother's parental rights and

approve the goal of adoption. On April 27, 2018, the circuit court entered a final order memorializing its rulings. This appeal followed.[3]

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Mother argues that the circuit court erred by terminating her parental rights under Code § 16.1-283(B) and (C)(2) and approving the goal of adoption. Mother emphasizes that she complied with the Department's requests, including completing substance abuse treatment, maintaining stable housing and employment, participating in the psychological and parental capacity evaluations, participating in the attachment assessment, and consistently participating in visitation.

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

---

[3] The circuit court also terminated McGriff's parental rights and approved the goal of adoption for J.M. McGriff appealed the circuit court's rulings. See McGriff v. City of Roanoke Dep't of Soc. Servs., Record No. 0872-18-3.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005).

The Department referred mother to numerous services and acknowledged that she "took advantage of a number of the services offered to her." Despite all of the services, however, the circuit court found that mother was unable to remedy substantially the conditions that led to and required continuation of foster care for the children.

The Department offered visitation to mother, but eventually had to stop the visitations because of the negative impacts on the children. The children were anxious, aggressive, and out of control. The visitation supervisors noticed that although mother took parenting classes and received feedback, she was unable to implement the parenting skills that she had been taught. The Department presented evidence that both children's behaviors improved once visitations were reduced and stopped. J.M.'s counselor testified that mother was focused on her own issues, instead of focusing on J.M.'s needs. M.H.'s counselor testified that mother did not seem to understand attachment issues and what to expect from M.H.

Both Dr. Mundy and Brammer expressed concern about mother's ability to parent. Dr. Mundy testified that it would "take pretty much a lifetime" for mother to change her behavior and be able to parent her children effectively. Dr. Mundy noted that mother had a tendency "to place her own emotional needs above that of her children, leaving their safety and well-being secondary to her own interpersonal desires." Similarly, Brammer noticed that mother made "self-centered decisions without regard for her children's well-being." Brammer opined that mother "lacks the secure attachment patterns, emotional maturity, parenting skills, and

psychological resources which would be necessary to help [the children] recover and thrive if they are placed in [her] care."

At the time of the April 2018 hearing, the children had been in foster care for two years. The Department's evidence proved that both children had special needs. J.M.'s counselor testified that J.M. was "very sensitive to changes" and needed structure, a routine, and a "safe [and] stable home." J.M.'s counselor opined that it was important for J.M.'s caregivers to "understand how to work with a child who has a trauma history and how to handle his tantrums, how to sort of provide kind and firm boundaries with him." M.H.'s counselor testified that M.H. suffered from trauma and struggled with attachment issues. However, his counselor was working on attachment therapy with him, and she saw progress with him and his foster mother. M.H.'s counselor also stressed the importance of structure, stability, and routine for M.H. The evidence proved that as of the circuit court hearing, mother was unable to provide the structure and stability that the children needed.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Considering the totality of the evidence, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2). "When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination

of parental rights pursuant to another subsection).  Therefore, we will not consider whether the

circuit court erred in terminating mother's parental rights under Code § 16.1-283(B).[4]

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.

---

[4] With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." Toms, 46 Va. App. at 265 n.3.